**IN THE UNITED STATED DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PATRICIA E. WHITE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Civil Act. No. 07-1507 |
| v. | ) | Hon. Nora Barry Fischer |
| | ) | |
| COMMUNITY CARE, INC, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

## I.      Introduction

This is an employment discrimination action. Plaintiff Patricia White ("Plaintiff") alleges that Defendant Community Care, Inc. ("Defendant"), for whom she worked from 2004 until 2007, discriminated against her based upon her race and retaliated against her in violation of Title VII, 42 U.S.C. 2000e-1, *et seq.*, 42 U.S.C. § 1981, and the Pennsylvania Human Relations Act, 43 Pa. Stat. § 951, *et seq.* ("PHRA"). Before the Court is Defendant's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. After careful consideration and for the reasons that follow, Defendant's Motion is denied.

## II.      Factual Background

### A.      Local Rule 56.1 Violation

At the outset, the Court notes Defendant's violation of Rule 56.1(c) of the Local Rules of this Court ("L.R. 56.1(c)").[1] In support of its Motion for Summary Judgment,

---

[1]      Rule 56.1(c)(1) of the Local Rules of the United States District Court for the Western District of Pennsylvania mandates that the opposing party's response to a motion for

1

Defendant filed a Concise Statement of Material Facts. (Docket No. 67). In Response, Plaintiff filed her Concise Statement of Material Facts Precluding Summary Judgment (Docket No. 69) and her Response to Defendant's Concise Statement of Material Facts (Docket No. 70). Defendant has failed to respond to the additional facts alleged by Plaintiff in her Concise Statement of Material Facts Precluding Summary Judgment (Docket No. 69). Local Rule 56.1(E) ("L.R. 56.1(E)") sets forth the consequences for failure to comply with L.R. 56.1 (c) as follows:

> alleged material facts set forth in the moving party's Concise Statement of Material Facts or in the opposing party's Response to Defendant's Concise Statement of Material Facts, which are claimed to be undisputed, will for the purposes of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party.

_____

summary judgment include:

> A separately filed concise statement, which responds to each numbered paragraph in the moving party's Concise Statement of Material Facts by:
>
> (a)    admitting or denying whether each fact contained in the moving party's Concise Statement of Material Facts is undisputed and/or material;
>
> (b)    setting forth the basis for the denial if any fact contained in the moving party's Concise Statement of Material Facts is not admitted in its entirety (as to whether it is undisputed or material), with appropriate reference to the record (*See* L.R. 56.1(b)(1) for instructions regarding format and annotation); *and*
>
> (c)    setting forth in separately numbered paragraphs any other material facts that are allegedly at issue, and/or that the opposing party asserts are necessary for the court to determine the motion for summary judgement[.]

W.D.Pa.L.R. 56.1(c)(1)(2008) (emphasis added).

W.D.Pa.L.R. 56.1(E) (2008). Thus, for the purposes of the instant motion, the facts, as set forth in the Plaintiff's Concise Statement of Material Facts Precluding Summary Judgment, (Docket No. 69) are deemed admitted by the Defendant, in accordance with L.R. 56.1(E). *See Janokowski v. Demand*, Civ. Action No. 06-00618, 2008 WL 1901347, at *1 (W.D.Pa. April 25, 2008) (Defendant's statement of material facts were deemed admitted for the purpose of summary judgment because of Plaintiff's violation of Local Rule 56.1(c)); *see also GNC Franchising LLC v. Kahn,* Civ. Action Nos. 05-1341; 06-00238, 2008 WL 612749, at *1 (W.D.Pa. Mar. 3, 2008) (The facts set forth in Plaintiff's statement of facts were deemed admitted by Defendants due to Defendant's violation of Local Rule 56.1(E)); *Ferace v. Hawley*, Civ. Action No. 05-1259, 2007 WL 2823477, at *1 (W.D.Pa. Sept. 26, 2007) (citing *Benko v. Portage Area School Dist.*, Civ. Action No. 03-233J, 2006 WL 1698317 (W.D.Pa. June 19, 2006)).

**B.    Facts**[2]

The Court has gleaned the following factual background from the parties' summary judgment filings.

### 1.    Background

Defendant provides in-home health services to various clients throughout Western Pennsylvania by providing qualified nurses to treat people in their residences, as needed, and staffs nurses in different types of facilities, including nursing homes. (Docket No. 67 at ¶ 1, Docket No. 70 at ¶ 1).   Defendant is a Pennsylvania-licensed and Medicare-

---

[2]    Given Defendant's failure to respond appropriately to the Concise Statement of Material Facts Precluding Summary Judgment filed by Plaintiff, the facts asserted by the Plaintiff are deemed admitted and are relied upon by this Court in making its rulings.

certified home health agency. (Docket No. 71-4 at 12). Plaintiff, an African-American, is a licensed Practical Nurse and a Respiratory Therapist who has been employed by Defendant since May of 2004. (Docket No. 67 at ¶ 2, Docket No. 70 at ¶ 2; Docket No. 69 at ¶ 5). As a pediatric staff nurse, Plaintiff has provided in home skilled nursing services to the clients of Defendant, special needs children and their families. (Docket No. 69 at ¶ 7). By all accounts, Plaintiff was "a very valuable employee," a good nurse, had perfect attendance, and Defendant never had any problem with her work. (Docket no. 69 at ¶ 11).

Defendant assigns case managers to individual clients, who are responsible for managing the assigned nurses and act as an intermediary between the staff nurse and the administrator. (Docket No. 69 at ¶ 8). At all relevant times, Susan Watson ("Watson") was Plaintiff's case manager, while Wasil Waleski ("Waleski") was Defendant's administrator who oversaw the company as a whole. (Docket No. 69 at ¶¶ 9-10).

Defendant was contacted by Mark and Ann Caton to provide in-home treatment for their daughter, Marilyn Caton, a child with special needs and respiratory problems. (Docket No. 69 at ¶ 12). The position was scheduled to start when Marilyn was released from the hospital. *Id*. On January 15, 2007, Plaintiff was offered the job by her supervisor, Watson. (Docket No. 67 ¶ 8, Docket No. 70 at ¶ 8, Docket No. 69 at ¶ 12). On that same day, she accepted the offer, and expressed to Watson that she was excited about the opportunity because the Catons lived on her street; thus, she would not have to travel far for work. (Docket No. 67 at ¶ 8, Docket No. 69 at ¶ 12, Docket No. 70 at ¶ 8);(Docket No. 69 at ¶ 13).

After Plaintiff accepted the position in the Caton household, Watson made a schedule of days and times that Plaintiff would work for the Catons, and provided the family with that information. (Docket No. 67 at ¶ 9, Docket No. 70 at ¶ 9). After reviewing the tentative schedule, Watson claims that Seth Caton, Mark and Ann's oldest son, called to inform her that the Caton family did not want Plaintiff to provide nursing services to Marilyn because Plaintiff was "not a nice person and was not nice to them when they were children." (Docket No. 67 at ¶ 11, Docket No. 69 ¶ 14). However, Seth Caton denies making these statements. (Docket No. 70 at ¶ 11; Docket No. 69 at ¶ 30).

Additionally, Seth and Ann Caton both deny making any sort of statement to Watson about Plaintiff not being a nice person. (Docket No. 69 at ¶¶ 30, 31). Instead, Ann and Seth Caton testified they told Watson they did not want Plaintiff in their home because she was their neighbor. (Docket No. 69 at ¶ 32). To the contrary, Watson claims that she was never informed that the Catons did not want Plaintiff in their home because she was a neighbor. (Docket No. 69 at ¶ 33). However, Watson's assistant, Alisha Giannattasio, testfied that Watson told her that the Catons did not want Plaintiff in the house because she was a neighbor. (Docket No. 69 at ¶ 34). According to Watson, a client and a nurse being neighbors is not a valid reason to refuse a nurse's services; therefore, such a request would not be honored. (Docket No. 69 at ¶ 35).

On January 22, 2007,[3] before Plaintiff was to start her new position, Watson contacted her by phone to inform her that she was no longer assigned to the Caton family. (Docket No. 67 at ¶ 12; Docket No. 70 at ¶ 12; Docket No. 69 at ¶ 14). During this conversation, Plaintiff asked why she was no longer assigned to the Catons, whereupon Watson informed her that Seth Caton told her that Plaintiff was "not a nice person to them when they (Caton children) were children." (Docket No. 67 at ¶ 13, Docket No. 70 at ¶ 13). According to Plaintiff, Watson initially relayed that the reason the Catons did not want Plaintiff to work in their house was because she not a nice person to them when they were children. However, Watson later admitted that the actual reason was that the Catons did not want Plaintiff in the house because she was black. (Docket No. 70 ¶ 13; Docket No. 69 at ¶¶ 18, 19).

The parties dispute the substance and sequence of what transpired between Plaintiff and Watson during the remainder of this phone conversation. According to Defendant, Plaintiff believed that the Catons did not want her in their house because she was not nice to the children. (Docket No. 67 at ¶ 14). She then stated to Watson that she is a nice person and the true reason was "because she is black." (*Id.*). In response, Watson said to Plaintiff that "no one has said that. That's not what the Catons are saying." (Docket No. 67 at ¶ 14; Docket No. 67 at 15). Plaintiff, however, alleges that she did not believe it was true that Seth Caton did not want her in the house because she

_____

[3]

Plaintiff asserts that this conversation took place on January 17, 2007. (Docket No. 69 at ¶ 14). However, Watson testified that this conversation occurred on January 22, 2007. (Docket No. 71-3 at 8).

was not a "nice person," and that it was not Plaintiff, but Watson, who said that the Catons did not want her in the house because she was black. (Docket No. 70 at ¶ 14, Docket No. 69 at ¶ 19).

Plaintiff also contends that Watson said she had not initially wanted to tell her the real reason, that is, because she was black, because she did not want to hurt her feelings. (Docket No. 69 at ¶ 22). Additionally, Plaintiff alleges that Watson never told her the Catons did not make racist remarks. (Docket No. 69 at ¶ 24).

During the same conversation, Plaintiff informed Watson that the reason given by Defendant and the Catons was discriminatory and prejudicial, and that she would seek legal action. (Docket No. 69 at ¶ 20). Later that day, Plaintiff placed notes of the conversation on her calendar, in which she transcribed that "SW called denied job. Seth (son) & mom said not a nice per. Didn't treat children nice. Not true. What is real reason why? SW told me because I'm black. No other reason." (Docket No. 69 at ¶ 25). Plaintiff explained that her notes reflect that Watson was "asking...why and then the real reason [Watson] tells me, because I'm black." (*Id.*).

During the same conversation, Defendant claims that Watson offered Plaintiff two other job opportunities in the Uniontown Area: one with the Beal family and one with Watson's own child. (Docket No. 67 at ¶¶ 16, 17). Plaintiff denies that she was ever offered these positions or any positions in the Uniontown area during that conversation or at any later time. (Docket No. 70 at ¶¶ 16-17). In addition, Watson's assistant denies that Plaintiff was offered the Beal position. (Docket No. 70 at ¶ 17). Plaintiff also points out that Watson's handwritten notes, taken after January 17, 2007,

make no mention of Watson offering Plaintiff a position to work with her own child. (Docket No. 70 at ¶ 17).

### 2.    Plaintiff's Replacements

As to the Caton position, Defendant replaced Plaintiff with two nurses, Marsha Balaban and Wanda Nicholson, neither of whom are African American.  (Docket No. 69 at ¶¶ 36-37).  In fact, since January 27, 2008, out of twenty one nurses that Defendant has offered and the Catons have considered, only one was African American. (Docket No. 69 at ¶38).  This nurse was Jennifer Key, who worked for the Catons for about three months beginning in December of 2007. (Docket No. 69 at ¶ 39).  Her placement in the Caton home occurred after the instant lawsuit was filed. (Docket No. 69 at ¶ 40).

### 3.    Defendant's Discrimination Policies

Defendant has two policies against discrimination; one is found in a handbook distributed to all employees, while the other is included in a general employee grievance procedure that all Medicare-licensed agencies are required to use. (Docket No. 69 at ¶ 41).  The handbook identifies Waleski as the individual whom employees should contact regarding discrimination complaints. (Docket No. 69 at ¶ 42).  On the other hand, the Medicare policy states that employees are to report complaints to their immediate supervisors. (Docket No. 69 at ¶ 43).  According to Waleski, the Medicare policy, which employees do not possess, trumps the handbook, which the employees do possess. (Docket No. 69 at ¶ 44).  Thus, employees are to report discrimination first to their immediate supervisors. (Docket No. 69 at ¶ 44).

Defendant's handbook policy prohibits discrimination on the basis of race both by non-employees and employees. (Docket No. 69 at ¶¶ 45, 46). Thus, a client's refusal to allow a nurse in the home because of race would fall under said policy. (Docket No. 69 at ¶ 47). Further, if a client refused a nurse's care based on race, Defendant would have to refuse service to the client. (Docket No. 69 at ¶ 48). Additionally, once a complaint has been made, Defendant has a duty to investigate the claim. (Docket No. 69 at ¶ 48). For example, once a complaint has been made to a supervisor, the supervisor is to notify Waleski regarding same. (Docket No. 69 at ¶ 49). Waleski then determines whether discrimination did, in fact, occur. (Docket No. 69 at ¶ 50).

Plaintiff claims that she tried to call Waleski several times about her complaint of discrimination, but that he never returned her call. (Docket No. 69 at ¶ 52). Waleski testified that he recalled getting a voice mail from Plaintiff, after learning that she made allegations of discrimination to Watson. (Docket No. 69 at ¶ 54). Waleski did not personally return Plaintiff's call, but, instead, asked Watson to return the call for him. (Docket No. 69 at ¶57). Watson never returned the call for Waleski. Indeed, Watson and Plaintiff have not spoken since the call in late January of 2007. (Docket No. 69 at ¶ 58).

Watson alleges that Plaintiff never made a formal complaint of discrimination, however, she did admit that Plaintiff claimed racial discrimination during the previously described phone call. (Docket No. 69 at ¶ 59). On the other hand, Waleski believes that Plaintiff made an allegation of discrimination. (Docket No. 69 at ¶ 60). Waleski instructed Watson to write a note to the human resources department about Plaintiff's

complaint. (Docket No. 69 at ¶ 63). Watson documented her conversation with Plaintiff, stating that Seth Caton said the family did not want White as a nurse because she was not a nice person and did not treat them nicely when they were children. She also wrote "I relayed this info to Mrs. White, she felt [the] family was being racist and prejudice [sic] against her." (Docket No. 69 at ¶ 64). However, neither Waleski nor Watson, nor anyone else on behalf of Defendant, investigated the allegations of discrimination. (Docket No 69 at ¶ 68, 69, 73, 75).

A short time thereafter, Plaintiff filed a *pro-se* complaint with the Pennsylvania Human Relations Commission ("PHRA"). (Docket No. 67 at ¶ 21, Docket No. 70 at ¶ 21). Between the time Defendant removed Plaintiff from the Caton case in January 2007 and the filing of her Second Amended Complaint on February 28, 2008, Defendant offered Plaintiff one employment position. (Docket No. 69 at ¶ 84). The position was too far for Plaintiff to travel, which Watson knew, so Plaintiff declined the offer.[4] (Docket No. 69 at ¶ 85). Defendant is and has been aware of Plaintiff's travel restrictions. Hence, it was foreseeable that Plaintiff would have to decline said position. (Docket No. 69 at ¶¶ 82, 83, 84). According to Plaintiff, Defendant never offered her any positions within her travel restrictions, although there have been multiple job openings available since January of 2007. (Docket No. 69 at ¶ 86).

---

[4]     Shortly before Plaintiff was rejected from the Caton case, she gave Defendant a doctor's note indicating that she suffered from high blood pressure, which was aggravated when she drove long distances. (Docket No. 69 at ¶ 81). Thus, Plaintiff could not travel more than 14 miles one way from her home in Uniontown. (Docket No. 69 at ¶ 82).

Defendant also claims that it never fired Plaintiff. However, Plaintiff points out that she received a post card from Defendant, stating, "we invite you to come back", and "re-apply on our website." (Docket No. 69 at ¶¶ 94, 95).[5]

As previously stated, upon retracting the Caton job offer, Defendant replaced Plaintiff with two staff nurses, neither of whom were African American. (Docket No. 69 at ¶¶ 36, 37). The Caton position was vacant until March of 2008, although at least 21 nurses were considered. (Docket No. 69 at ¶¶ 38, 103, 105). Only one of the subsequent nurses considered was African American. (Docket No. 69 at ¶38).

Defendant offered a second position to Plaintiff in May of 2008, which she accepted. (Docket No. 69 at ¶ 96). The position ended in June of 2008 and Plaintiff has not been offered additional jobs by Defendant. (Docket No. 69 at ¶¶ 98, 99).[6]

## III.    Procedural History

Plaintiff commenced this action on November 6, 2007 by filing a complaint against Community Care, Inc., Mike Caton, and Ann Caton. (Docket No. 1). Thereafter, on November 29, 2007, Plaintiff filed an Amended Complaint against Community Care, Inc., Mike Caton, and Ann Caton. (Docket No. 9). Defendant Community Care filed its Answer to said Amended Complaint on January 6, 2008. (Docket No. 15). On January 17, 2008, Defendants Mike and Ann Caton filed an Amended Motion to Dismiss for Lack of Jurisdiction and a Motion to Dismiss for Failure to State a Claim. (Docket No.

---

[6]

     As of the Oral Argument held on November 14, 2008, counsel for the parties indicated that Plaintiff is not working full time. (Docket No. 74).

23). In response, Plaintiff filed her Brief in Opposition on February 6, 2008. (Docket No. 25).

The Court, after being advised by counsel for Plaintiff during its case management conference that a Second Amended Complaint would be filed, denied Defendants Mark and Ann Caton's Motion to Dismiss in its entirety, without prejudice on February 22, 2008. (Docket No. 30). Plaintiff filed her Second Amended Complaint against Community Care, Inc., Mark Caton, and Ann Caton on February 28, 2008. (Docket No. 33). Thereafter, on March 17, 2008, all of the Defendants filed their Answers to the Second Amended Complaint. (Docket Nos. 35 and 36). On June 30, 2008, Plaintiff filed a Stipulation of Dismissal as to Defendants Mark and Ann Caton, which the Court granted that same day. (Docket Nos. 45, 46). Subsequently, the Court conducted a settlement conference on July 25, 2008; however, the case did not settle. (Docket No. 48). The next day, Defendant filed a Motion for Leave of Court to Reopen Discovery, which this Court denied by Memorandum Order on August 29, 2008. (Docket Nos. 53 and 56).

Defendant then filed its Motion for Summary Judgment and Brief in Support on October 2, 2008. However, on October 6, 2008, the Court denied said Motion for failure to comply with the Local Rule 56.1 and this Court's Policies and Procedures, permitting Defendant to re-file by October 10, 2008. (Docket No. 59). Accordingly, on October 8, 2008, Defendant filed its Renewed Motion for Summary Judgment (Docket No. 65), Brief in Support (Docket No. 66), and its Concise Statement of Material Facts. (Docket No. 67). In response, Plaintiff filed her Brief in Opposition (Docket No. 68),

her Response to Defendant's Concise Statement of Facts (Docket No. 70), and her Concise Statement of Material Facts Precluding Summary Judgment (Docket No. 69). Defendant did not reply to Plaintiffs' Concise Statement of Material Facts Precluding Summary Judgment.   On October 13, 2008, Defendant filed a motion requesting Oral Argument, which the Court granted on October 14, 2008. (Docket Nos. 72, 73). Oral Argument in this matter took place on November 14, 2008.  (Docket No. 74).

## IV.    Legal Standard

Summary judgment may only be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c);   Pursuant to Rule 56, the Court must enter summary judgment against the party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986).

 The dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005).  In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for

the non-moving party. *Id.* at 249. "The court may consider any material or evidence that would be admissible or usable at trial in deciding the merits of a motion for summary judgment." *Turner v. Leavitt*, Civil Action No. 05-942, 2008 WL 828033, at *4 (W.D. Pa. March 25, 2008) (citing *Horta v. Sullivan*, 4 F.3d 2, 8 (1st Cir. 1993) (citing10 WRIGHT AND MILLER, FEDERAL PRACTICE § 2721at 40 (2d ed.1983))); *Pollack v. City of Newark,* 147 F. Supp. 35, 39 (D.N.J. 1956), *aff'd*, 248 F.2d 543 (3d Cir. 1957), *cert. denied*, 355 U.S. 964 (1958) ("in considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or otherwise made admissible in evidence").

In evaluating the evidence, the Court must interpret the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in their favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007). However, the court must not engage in credibility determinations at the summary judgment stage. *Simpson v. Kay Jewelers*, *Div. Of Sterling, Inc.*, 142 F.3d 639, 643 n.3 (3d Cir. 1998)(quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994)).

In an employment discrimination case, the burden of persuasion on summary judgment remains unalterably with the employer as the movant. *Doe v. C.A.R.S.*, 527 F.3d 358, 362 (3d Cir. 2008). The employer must persuade the court that even if all the inferences which could reasonably be drawn from the evidentiary material of record were viewed in the light most favorable to the plaintiff, no reasonable jury could find in the plaintiff's favor. *Id.* (citing *Sorba v. Pennsylvania Drilling Co., Inc.*, 821 F.2d 200, 2001-02 (3d Cir. 1987), *cert. denied*, 484 U.S. 1019 (1988)).

Further, Local Rule of Court 56.1.E describes the consequences of either party's failure to follow the rules set forth pertaining to submission of concise statements of material facts and responsive concise statements of material facts for summary judgment motions stating that "facts claimed to be undisputed 'will for the purpose of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party.'"  W.D. Pa. L. R. 56.1(E);  *Hickenbottom v. Nassan*, 2007 U.S. Dist. LEXIS 24336, at *17 (W.D. Pa. Mar. 30, 2007).

## V.     Discussion

Plaintiff claims Defendant discriminated against her based on her race in violation of Section 1 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("§ 1981"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a) ("Title VII"), and the Pennsylvania Human Relations Act, 43 Pa. Conns. Stat. §§ 955(a) and 955(d) ("PHRA"), when it denied her employment opportunities because of her race.  Plaintiff also asserts that Defendant committed retaliatory acts against her in violation of Title VII and the PHRA when, after she opposed denial of the Caton job opportunity because of her race, it provided her with only one job opportunity which was too far to travel, thereby firing or refusing to hire her.   The Court will address each of Plaintiff's claims, in turn.

### A.     Race Discrimination Claims

42 U.S.C. § 1981 precludes discrimination because of race in the making and enforcement of contracts, which includes the enjoyment of all benefits, privileges, terms

and conditions of the contractual relationship. 42 U.S.C. § 1981. Title VII of the Civil Rights Act of 1964 forbids employment discrimination based on race, color, religion, sex, or national origin, and its anti-retaliation provision forbids discrimination against an employee or job applicant who, *inter alia*, has made a charge, testified, or participated in a Title VII proceeding or investigation. *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 59 (2006) (citing 42 U.S.C. § 2000e-3(a)).

Plaintiff claims she was subjected to discriminatory treatment by Defendant in violation of both Title VII[7] and § 1981. However, Defendant contends that these claims fail as a matter of law. In analyzing plaintiff's claims, the Court can rely on cases involving claims under either § 1981 or Title VII because "the elements of employment discrimination under Title VII are identical to the elements of a section 1981 claim." *Wilson v. Blockbuster, Inc.*, 571 F.Supp.2d 641, 647 n.6 (E.D.Pa. 2008)(citing *Schurr v. Resorts Int'l Hotel, Inc.,* 196 F.3d 486, 499 (3d Cir. 1999)).

Generally, there are two ways a plaintiff can prove unlawful discriminatory intent on the part of her employer: (1) by presenting direct evidence of discrimination that meets the requirements set forth in *Price Waterhouse* v. *Hopkins*, 490 U.S. 228 (1989); or (2) by indirect or circumstantial evidence that satisfies the three-step framework of *McDonnell Douglas*. *Fakete v. Aetna, Inc*., 308 F.3d 335 (3d Cir. 2002).

_____

[7]

As Title VII and the PHRA are interpreted under the same standards, Plaintiff's Title VII and PHRA claims will be discussed coextensively. *See Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996).

Plaintiff contends that she can establish her race discrimination claims through both types of evidence. (Docket No. 68 at 8). The Court agrees.

### 1. Direct Evidence

In a direct evidence case, the employee alleging discrimination must produce "direct evidence that decision makers placed substantial negative reliance on an illegitimate criterion in reaching their decision." *Price Waterhouse,* 490 U.S. at 277. Such evidence "leads not only to a ready logical inference of bias, but also a rational presumption that the person expressing bias acted on it" when it made the challenged employment decision. *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1097 (3d Cir. 1997). Direct evidence essentially requires an admission by the decision-maker that her actions were based on the prohibited animus. *Hossack v. Floor Covering Associates of Joilet, Inc.*, 492 F.3d 853 (7th Cir. 2007). "As such, because admissions are exceedingly rare in modern employment cases, "under the direct method we now also allow circumstantial evidence to be introduced." *Id.*

This case presents a rare instance of direct evidence. Plaintiff testified under oath that Watson, her supervisor, stated that she was denying her the Caton position because she was black. (Docket No. 69 at ¶ 1; Docket No. 70 at ¶ 11). It appears from the record that Defendant does not dispute that Watson made the decision to deny Plaintiff the Caton position. Thus, the Court must determine whether a reasonable jury could find, based on Watson's statement, that Plaintiff's race was more likely than not a substantial factor in Waston's decision to deny her the position. *Fakete*, 308 F.3d at

339.   Viewing this statement in the light most favorable to Plaintiff, it shows that Watson based her decision on Plaintiff's race.   According to Plaintiff, Watson made this statement in response to a question from Plaintiff as to why she was no longer assigned to the Caton position.   (Docket No. 67 at ¶ 13; Docket No. 70 at ¶ 13).   Although Watson did not initially inform Plaintiff of this reason, she later admitted that it was the real reason.   (Docket No. 70 at ¶ 13; Docket No. 69 at ¶¶ 18-19).   Plaintiff also contends that Waston stated that she had not initially wanted her to know the real reason (that is, because she is black) because she did not want to hurt her feelings.   (Docket No. 69 at ¶ 22).   In this context, a reasonable jury could find that Watson's statement was a clear, direct indication that Plaintiff was being denied the Caton position because of her race, especially because the statement was made during a conversation concerning Plaintiff's job.

On the other hand, Defendant, given Watson's testimony, contests that this statement was ever made; hence, creating a genuine issue of material fact as to whether Plaintiff's race was a substantial factor in Defendant's decision to deny her the Caton position.   The Court is mindful that it must not engage in credibility determinations at the summary judgment stage.   *See Metzfer v. Osbeck* 841 F.2d 518, 521 (3d Cir. 1988)("a court should be reluctant to grant a motion for summary judgment when resolution of the dispositive issue requires a determination of state of mind, for in such cases much depends upon the credibility of witnesses testifying as to their own states of mind, and assessing credibility is a delicate matter best left to the fact finder.")

Additionally, to the extent that Defendant relies on the Caton's customer preference as a justification for its action, the Court notes that customer preference has repeatedly been rejected as a justification for discrimination. *Cain v. Hyatt*, 734 F.Supp. 671, 681 (E.D. Pa 1990). In addition, this district has ruled previously that job assignments based on race constitute adverse employment actions. *Patterson v. UPMC South Hills Health Sys. Home Health, L.P.*, Civil Act. No. 03-89, at *22 (W.D. Pa. May 18, 2005; Docket No. 71-5 at 25). Based on the evidence Plaintiff has submitted, specifically, her testimony that Watson informed her that she was denied the Caton position because she was black, a reasonable jury could conclude that Defendant reassigned Plaintiff based on customer preference and/or her race.

Accordingly, as the Court finds that Plaintiff has presented sufficient direct evidence as to her race discrimination claims to survive summary judgment under the *Price Waterhouse* theory, the Court does not need to consider whether these claims can proceed under a *McDonnell Douglas* theory. *Fakete*, 308 F.3d at 340 (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002). ("[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination."). Nevertheless, the Court shall engage in such analysis.

### 2. Circumstantial Evidence

Discrimination claims based on circumstantial evidence brought under Title VII and § 1981 follow the analytical framework established by *McDonnell Douglas*. First, the plaintiff must establish a prima facie case of discrimination. *Sarullo v. U.S. Postal*

*Service*, 352 F.3d 789, 797 (3d Cir. 2003) (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506 (1993)).  Second, "upon such a showing by the plaintiff, the burden shifts to the employer to produce evidence of a legitimate nondiscriminatory reason for the adverse decision." *Sarullo,* 352 F.3d at 707  (citing *McDonnell Douglas,* 411 U.S. at 802). If the defendant meets this burden, the presumption of discriminatory action raised by the prima facie case is rebutted.  *Sarullo*, 352 F.3d at 707 (citing *Tex. Dep't. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 255 (1981)).  Third, the plaintiff must then demonstrate that the employer's articulated reason was not the actual reason for the unfavorable job action, but rather a pretext for discrimination.  *Id.* (citing *Burdine*, 450 U.S. at 253). Defendant contends that Plaintiff's discrimination claim fails because she cannot establish a prima facie case. Defendant further contends that even if Plaintiff could establish a prima facie case, her discrimination claim fails because she cannot show pretext. For the reasons discussed below, this Court disagrees with Defendant.

### A.    Prima facie case

In order to set forth a prima facie case of discrimination under Title VII and § 1981, Plaintiff must show that: (1) she is a member of a protected class; (2) she was the subject of an adverse employment action; (3) she was qualified for the position in question; and (4) the circumstances give rise to an inference of unlawful discrimination. *Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 356-57 (3d Cir. 1999).

Plaintiff claims, and Defendant does not dispute, that she can establish the first three elements of her prima facie case.  Plaintiff is in a protected class because her race is African American. (Docket No. 68 at 7).  In addition, Plaintiff claims that she suffered

"several adverse actions: she lost the Caton position itself; Defendant failed to assign her to a different patient when it denied [her] the Caton job; and Defendant essentially fired her by not scheduling her again for over a year." (Docket No. 68 at 7). Further, Plaintiff was qualified for the Caton position as a pediatric nurse and respiratory therapist. (Docket No. 68 at 7).

However, Defendant contends that Plaintiff cannot establish the fourth element of her prima facie case because Plaintiff cannot point to any evidence or facts that would support a conclusion that Defendant denied her the position in the Caton house based upon her race. (Docket No. 66 at 2). In response, Plaintiff argues that there are circumstances giving rise to an inference of race discrimination. Plaintiff asserts that although Watson initially told her that the Catons did not want her working in their house because she was not nice to Seth Caton as a child, Watson later told Plaintiff that the real reason was because she was black. (Docket No. 70 at 11; Docket No. 69 at ¶ 19). Defendant contests that Watson stated such a reason. (Docket No. 67 at ¶ 13). In fact, the exchange of reasons that is disputed took place during a pertinent conversation between Watson and Plaintiff. (Docket No. 67 at ¶¶ 14-15; Docket No. 70 at ¶ 14; Docket No. 69 at ¶¶ 19-24). The parties dispute the majority of the content of this conversation, including additional key facts, such as whether Watson offered Plaintiff two job positions. (Docket No. 67 at ¶¶ 16-17; Docket No. 70 at ¶ 17). Hence, on this basis alone, the Court concludes that genuine issues of material fact exist.

In addition, Plaintiff highlights the fact that she was replaced by non-black nurses, a fact which raises an inference of race discrimination. (Docket No. 68 at 10).

Specifically, Plaintiff alleges that once she was removed from the Caton case, Defendant replaced her with Marsha Balaban and Wanda Nicholson, neither of whom are African American.  (Docket No. 69 at ¶¶ 36-37).  Further, Plaintiff asserts that since she was removed from the case, the Catons have considered twenty-one nurses offered by Defendant, and only one of them was African American.  (Docket No. 69 at ¶ 38).  Specifically, the Catons permitted Jennifer Key, an African American nurse, to work in their home for about three months beginning in December 2007.  (Docket No. 69 at ¶ 39).[8]  Plaintiff contends that the fact that the Catons hired only one African Amercian nurse, and hired said nurse *after* she had filed this lawsuit, supports an inference of race discrimination.  The Court agrees. As the United States Court of Appeals for the Third Circuit reasoned in *Pivorotto*, "an employer's failure to hire someone of a different class from the plaintiff, after the plaintiff's discharge, could be explained in many different ways."  *Pivorotto*, 191 F.3d at 355.  For example, in anticipating litigation, employers may hire an employee in the same protected class as a plaintiff in an attempt to defeat a discrimination claim.  *Id*.

As such, viewing the facts of record in the light most favorable to Plaintiff, this Court cannot say, as a matter of law, that Plaintiff has not adduced evidence in support of an inference of race discrimination.  Plaintiff has, therefore, set forth sufficient facts to establish a prima facie case of discrimination.

---

[8]

Although Defendant failed to respond to these facts, Defendant does address and confirm these assertions in its Memorandum in Support.  (Docket No. 66 at 7).  However, Defendant contends that Jennifer Key worked in the Caton house for approximately six months, not three months. *Id*.

Moreover, the evidence of pretext which the Court will discuss below is also relevant in proving Plaintiff's prima facie case and further supports that Plaintiff has established the inference element of her prima facie case. *See Doe v. C.A.R.S.*, 527 F.3d 358, 370 (3d Cir. 2008)("Lastly, it is important to remember that the prima facie case and pretext inquiries often overlap. As our jurisprudence recognizes, evidence supporting the prima facie case is often in the pretext stage, and nothing about the *McDonnell Douglas* formula requires us to ration the evidence between one stage or the other.").

### B. Pretext

Because Plaintiff has made out a prima face case, the burden of production shifts to defendant, which must articulate a legitimate nondiscriminatory reason for its adverse employment action. *See Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). Once Defendant articulates a nondiscriminatory reason, Plaintiff must respond by citing evidence demonstrating that the rationale is pretextual. *Fuentes*, 32 F.3d at 763. In order to create a genuine issue of material fact as to whether the proffered reason is pretextual, Plaintiff must point to some evidence, direct or circumstantial, from which a fact finder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious reason was more likely than not a motivating or determinative cause of the employer's actions. *Fuentes*, 32 F.3d at 764. Where the Plaintiff does offer evidence that would allow reasonable minds to conclude that the evidence of pretext is more credible than the employer's justifications, the employer's motion for summary judgment must fail. *Iadimarco v. Runton*, 190 F.3d 151 (3d Cir.

1999) (citing *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 62 (3d Cir. 1989)("i[n] the context of a motion for summary judgment, the District Court cannot decide issues of fact")).

Defendant argues that Plaintiff's race discrimination claims fail because she cannot show that Defendant's legitimate business justification, that Plaintiff was not a nice person and that she did not treat Seth Caton nicely when he was a child, is a pretext for discrimination. (Docket No. 66 at 4). In response, Plaintiff contends that the record contains ample evidence from which a jury could find that this reason is pretextual. (Docket No. 68 at 11). Although Plaintiff points to several instances from which a jury can infer that Defendant's reason is pretextual, the Court declines to restate every instance as it is clear that genuine issues of material fact exist.

Plaintiff may discredit the Defendant's proffered reasons by demonstrating "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reasons." *Fuentes,* 32 F.3d at 765. Specifically, Plaintiff points out that Defendant's alleged legitimate business reason is called into question when compared to the testimony of Watson, the Catons, and Plaintiff. (Docket No. 68 at 11). According to Watson, the only person from the Caton family who called her concerning Plaintiff was Seth Caton. (Docket No. 69 at ¶ 2). However, Ann Caton testified that she had also discussed the issue of Plaintiff working in her home with Watson. (Docket No. 69 at ¶ 27). Further, Plaintiff alleges that Watson told her that she had discussed the situation with Ann Caton. (Docket No. 69 at ¶ 15). In addition, Watson alleges that the reason she did not permit Plaintiff to work at the Catons' house was because Seth Caton

had stated that Plaintiff was not a nice person and had not been nice to him when he was a child. (Docket No. 69 at ¶ 28). To the contrary, Seth Caton does not remember stating these reasons. (Docket No. 69 at ¶ 30). Further, Ann Caton testified that when she talked to Watson, she stated that the reason she did not want Plaintiff working in her home was because she did not want a neighbor caring for her child. (Docket No. 69 at ¶ 27). According to Plaintiff, Watson's initial reason involved the fact that the Catons said that she was not a nice person to them when they were children, yet later admitted that the actual reason was because she was black. (Docket No. 70 ¶ 13, Docket No. 69 at ¶¶ 18, 19).

Given the inconsistency in the above testimony, considering the facts in the light most favorable to Plaintiff and drawing all reasonable inferences in her favor, the evidence of record could persuade a reasonable jury that Defendant's real reason for denying Plaintiff the Caton job was discrimination. Moreover, as the testimony provided by the various witnesses does not uniformly support Defendant's articulated reason,[9] said testimony requires credibility determinations, which are best left to the factfinder. *See Metzfer v. Osbeck* 841 F.2d 518, 521 (3d Cir. 1988)("[a] court should be reluctant to grant a motion for summary judgment when resolution of the dispositive issue requires a determination of state of mind, for in such cases much depends upon the credibility of witnesses testifying as to their own states of mind, and assessing credibility is a delicate matter best left to the fact finder.").

---

[9] Defendant alleges that Plaintiff was denied the Caton position because she was not a nice person to the Caton children when they were children. (Docket No. 67 at ¶ 13).

The Court notes that Defendant, in its brief and at oral argument, focuses on the fact that Plaintiff's own handwritten statements, i.e. her calendar notes, and Plaintiff's letter to the PHRC contradict her own testimony and support Watson's testimony that Plaintiff was denied the job because the Caton family believed that she was not a nice person and did not treat the children well. (Docket No. 66 at 5-7). However, Plaintiff disputes Defendant's interpretation of such notes and letters, arguing that they set forth and support the Plaintiff's allegations of race discrimination. (Docket No. 69 at ¶ 25).[10] The Court concludes that the substance of Plaintiff's calendar notes and the content of her PHRC letter are best left to cross examination at trial as they raise questions of fact that should be determined by a jury.

Finally, Plaintiff suggests that a jury could find Defendant's articulated business justification to be pretextual based on the fact that Defendant violated its own employment policy. (Docket No. 68 at 14). The Court agrees and points to the following. First, Defendant has two inconsistent policies concerning reporting discrimination, and admits that the controlling policy is not possessed by its employees. (Docket No. 69 at ¶¶ 42; 44). Secondly, Defendant admits that according to its policy, a client's refusal to allow a nurse into his home based upon either race or the fact that the nurse is a neighbor, are not valid reasons for declining service; hence, Defendant would refuse service to such client. (Docket No. 69 at ¶ 35). Thirdly, Defendant asserts that once a complaint of discrimination is brought to the attention of a supervisor, Defendant

---

[10]

In addition, at oral argument, the dispute involving the content and meaning of Plaintiff's PHRC letter was made apparent.

has a duty to investigate. (Docket No. 69 at ¶¶ 59-60; Docket No. 71-4). Fourth,[11] as these facts are admitted for the purpose of ruling on Defendant's motion, it is possible that a jury could infer from Defendant's action or inaction that it failed to adequately address the situation involving Plaintiff and the Catons. (*See* Docket No. 69 at ¶¶51-76). A jury could infer pretext from the facts that Defendant failed to supply its employees with its *controlling* discrimination policy[12] and that it may have departed from its discrimination investigation procedure. Therefore, viewing the record in the light most favorable to Plaintiff as this court must, the Court finds that there are genuine issues of material facts with respect to Defendant's discrimination policies, particularly, the enforcement of same. *Colgan v. Fischer Scientific Co.*, 935 F.2d 1407, 1423 (3d Cir. 1991).

### B. Retaliation

In order to establish a prima facie case of retaliation under Title VII and § 1981, Plaintiff must establish the following: (1) that she engaged in protected activity; (2) that Defendant took an adverse employment action against her; and (3) that a causal connection exists between her participation in the protected activity and the adverse employment action. *Weston v. Pennsylvania*, 251 F.3d 420, 430 (3d Cir. 2001).

---

[11] Defendant did not specifically respond to Plaintiff's allegations as required by our Local Rule, *See* W.D.Pa.L.R. 56.1(c) and (e).

[12] *See* discussion on p. 25; *See also* Defendant's Staff Grievance Procedure that all Medicare-licensed agencies must utilize. (Docket No. 71-4).

Plaintiff claims that she was subjected to retaliatory action because Defendant failed to schedule Plaintiff for a position after she made her complaint of discrimination.

### 1. Prima Facie Case

Defendant appears to only dispute the second element of Plaintiff's prima facie case for retaliation. Defendant contends that Plaintiff did not suffer an adverse employment action as it offered Plaintiff numerous jobs. (Docket No. 66 at 9). Initially, Defendant claims that Watson offered Plaintiff two job opportunities in the Uniontown Area; one with the Beal family and one with Watson's own child, during the disputed conversation between Watson and Plaintiff. (Docket No. 67 at ¶¶ 16, 17). Defendant relies on the testimony of Jill Dempsey to support its position. (Docket No. 66 at 9). Ms. Dempsey testified that Plaintiff had told her that Watson offered her a job taking care of Watson's daughter, but that she did not believe it was a real offer because it was not a full time employment position. (Docket No. 66-5 at 14-15). Although Ms. Dempsey does not recall when this conversation took place, she testified that it was not during the same conversation she had with Plaintiff concerning her race and the Caton position. (*Id*. at 15).

Plaintiff disputes this recitation of the facts, and instead claims that Watson did not offer her the above positions during that conversation or at any later time. In addition, Plaintiff asserts that Watson's assistant denies that Plaintiff was offered the Beal job. (Docket No. 70 at ¶¶ 16, 17). Plaintiff also points out that Watson's handwritten notes taken after January 17, 2007 make no mention of Watson offering Plaintiff a position to work with her child. (Docket No. 70 at ¶ 17).

In *Burlington v. White*, 548 U.S. 53, 68 (2006), the Supreme Court held that the adverse action must be material, "which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." The Court required material adversity because "it is important to separate significant from trivial harms." *Id*. at 68. Further, the Court "phrased the standard in general terms because the insignificance of any given act of retaliation will often depend on the particular circumstances. Context matters." *Id*. at 69. Moreover, employer actions prohibited from the anti-retaliation provision are not limited to conduct that "affects the employees's compensation, terms, conditions, or privileges of employment" and that reassignment of job duties can constitute a materially adverse action. *Id*. at 71.

Due to the unique circumstances in this case, the Court finds that there are genuine issues of material fact concerning whether Defendant took an adverse employment action against Plaintiff. Viewing the record in the light most favorable to Plaintiff, this Court finds that a jury could determine that as Plaintiff was not offered any assignments following the Caton opportunity and that she received an invitation to "come back" and "reapply," that Plaintiff was discharged from employment. Said discharge would certainly amount to an adverse employment action. *Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 288 (3d Cir. 2001)(termination clearly fulfills the adverse employment action prong of a prima facie case of retaliation). Further, the Court finds that even if Plaintiff was not constructively discharged after her complaint of discrimination, a reasonable employee in Plaintiff's position might have been dissuaded from making a charge of discrimination, if the result would amount to

no future work placements or reassignments. *White*, 548 U.S. 68, 71. Because there are factual questions as to whether Plaintiff was discharged or offered any subsequent positions, the Court finds that there are genuine issues of material fact with respect to her claim of adverse action. Thus, Plaintiff has proved a prima facie case of retaliation.

## 2. Pretext

Defendant appears to argue that even if Plaintiff can prove a prima facie case for retaliation, Plaintiff cannot demonstrate that Defendant's reason for not assigning Plaintiff any positions was pretextual. Defendant contends that "they have not retaliated against Plaintiff by not offering her any new jobs, but rather there simply were not any new jobs available within Plaintiff's self imposed driving distance." (Docket No. 66 at 10). In response, Plaintiff asserts that Defendant never offered her any positions in the Uniontown area, which is within her driving range, despite the fact that "quite a few" cases have been available within 20 miles of Uniontown since January 2007. (Docket No. 69 at ¶ 86). Specifically, in addition to the Watson and Beal positions,[13] White was not offered a position with a case that opened in Uniontown and a case that opened in Dunbar, which is approximately ten miles away from Uniontown. (Docket No. 69 at ¶ 87). The Court also notes that Plaintiff's contentions concerning her retaliation claim are deemed admitted for the purpose of this motion as Defendant failed to respond to same. W.D. L.R. 56.1 (C) and (E). (*See* Docket No. 69 at ¶¶ 84-87).

---

[13] The parties dispute whether Plaintiff was offered positions with Watson's own child and the Beal family. (Docket No. 67 at ¶¶ 16-19; Docket No. 70 at ¶¶ 17-19)

As further evidence that Defendant's reason is pretextual, Plaintiff contends that Defendant's proffered non-discriminatory reason was a post hoc fabrication.[14] (Docket No. 68 at 21-22).  In support of this argument, Plaintiff focuses on an undated human resources note written by Kristin Gantt[15] which states that "Patty White was offered shifts at facilities within the last 18 months.  Patty declined all shifts, giving the reason that the work was too far and she would not travel that far."  (Docket No. 69 at ¶ 88). Although Gantt does not typically document this type of information in a home care nurse's file, Gantt testified that Waston directed her to document the same.  (Docket No. 69 at ¶¶ 91-92). In addition, Gantt does not remember when she wrote this document or when she offered facility shifts to Plaintiff. (Docket No. 69 at ¶90). However, Plaintiff testified that Gantt did not offer her any positions after her complaint of discrimination. (*Id.* at ¶ 89).

Moreover, as Plaintiff argued above, Plaintiff asserts that Defendant's violation of its own employment and discrimination policies is also evidence of pretext. (Docket No. 68 at 20-21; *See supra* at § V. A. 2.).

---

[14]

Post hoc is defined as "after this." BLACK'S LAW DICTIONARY 1205 (8th ed. 2004). Further, fabricated evidence is defined as "false or deceitful evidence that is unlawfully created after the relevant event, in an attempt to achieve or avoid liability or conviction." BLACK'S LAW DICTIONARY 597 (8th ed. 2004).  Accordingly, courts have held that to avoid summary judgment, plaintiff's evidence rebutting an employer's proffered reason must allow a fact finder to reasonably infer that the reason is either a post hoc fabrication or otherwise did not actually motivate the employment action.  *Fuentes*, 32 F.3d at 764.

[15]

Although Kristin Gantt's deposition does not establish her position or exact title with Defendant, it appears that she is in charge of scheduling.  (See Docket No. 71-4 at 35).

As set forth above, there are genuine issues of material fact concerning whether Defendant offered Plaintiff any positions. A determination of these facts would certainly require the Court to weigh the credibility of the witnesses which is not proper at the summary judgment stage. *Simpson*, 142 F.3d at 643 n.3. Further, given the contradictory testimony and drawing all inferences in Plaintiff's favor, a jury could conclude that Gantt's undated form amounted to an attempt by defendant to create "after the fact" evidence, thereby casting doubt on Defendant's rationale and supporting a finding of pretext. *See Lawrence v. National Webster Bank New Jersey*, 98 F.3d 61, 67 (3d Cir. 1996). Finally, the same evidence supporting the Plaintiff's prima facie case may also be used to show pretext. *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 286 (3d Cir. 2000).[16]

### D. PHRA Claim

Defendant also asserts that Plaintiff should be prohibited from re-litigating her PHRA claim because the PHRC reviewed her claim and determined that the matter should be closed administratively. (Docket No. 66 at 13). The Court finds that Defendant's argument has no merit.

---

[16] Defendant also argues that Plaintiff's claims of discrimination and retaliation are economically implausible as Defendant only makes money when it places nurses into client's homes. (Docket No. 66 at 14). The Court finds this argument to be without merit. As Defendant agrees, the case it relies upon, *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, is factually distinguishable from this case. In addition, this case involves numerous genuine issues of material fact that involve credibility determinations of key witnesses. Likewise, in this Court's estimation, whether Defendant was motivated by discrimination or for economic reasons, is best left for the jury to determine.

To bring suit under the PHRA, a plaintiff must first have filed an administrative complaint with the PHRC. 43 Pa. Cons. Stat. §§ 959(a) and 962; *Woodson v. Scott Paper Co.*, 109 F.3d 913 (3d Cir. 1997). Further, the filing of PHRA complaint does not bar a plaintiff from bringing an action in court. 43 Pa. Cons. Stat. § 962(c)(1). ("In cases involving a claim of discrimination, if a complainant invokes the procedures set forth in [the PHRA] the individual's right of action in the courts of the Commonwealth shall not be foreclosed."). Likewise, pursuant to 28 U.S.C. § 1367, a plaintiff would not be foreclosed from bringing an action in federal court because this Court is empowered to exercise supplemental jurisdiction over the PHRA claim. 28 U.S.C. § 1367. Moreover, the administrative closing of a claim by the PHRA is not a final adjudication. *See Baker v. PHRC*, 462 A.2d 881, 885 (Pa. Commw. Ct. 1983)("the no-probable-cause determination, when made merely after investigation, is not final in that it is not a complete, valid adjudication."); *see also McDonnell Douglas*, 411 U.S. at 799 ("The Commission itself does not consider the absence of a 'reasonable cause' determination as providing employer immunity from similar charges in federal court ... in view of the large volume of complaints before the Commission and the nonadversary character of many of its proceedings, court actions under Title VII are de novo proceedings and a Commission 'no reasonable cause' finding does not bar a lawsuit in the case.").

Accordingly, Plaintiff's PHRA claim is properly before this Court.

**VI.     Conclusion**

Accordingly, based on the foregoing, the Court DENIES Defendant's motion

for summary judgment [65].

*/s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Dated:     December 11, 2008

cc/ecf:     All counsel of record